IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-02378-MSK-BNB

SHERRY M. TIMM,

        Plaintiff,

v.

PRUDENTIAL INSURANCE COMPANY OF AMERICA,
a/k/a Prudential Financial and a/k/a Prudential Disability Management Services,

        Defendant.

---

## OPINION AND ORDER

---

**THIS MATTER** comes before the Court as an appeal from the determination of an

ERISA Plan Administrator.  The parties have filed the Administrative Record (**# 44,** as

supplemented **# 45, 49**), have filed cross-motions (**# 50, 52**) seeking judgment on that record, and

have responded (**# 61, 62**) to each others' motion.

1

## **FACTS**[1]

The Plaintiff is approximately 50 years old, and was employed by former Defendant Panasonic Corporation of America, Inc. ("Panasonic"), through its Matsushita subdivision, from 1987 to 2002. At the time of the events at issue, she was employed as a Senior Sales Representative, a position that entailed managing the accounts of Panasonic dealers in several states.

The Plaintiff is covered by a Long-Term Disability Insurance Plan ("the Plan"), administered[2] by Defendant Prudential Insurance Co. ("Prudential"). The Plan provides for benefits to be paid if the Plaintiff becomes "disabled." Under the Plan's definitions, the Plaintiff would be disabled if she is "unable to perform the material and substantial duties" of her job due

---

[1]The Court has found it difficult to review the Administrative Record for several reasons. First, the record does not appear to be organized in any particularly helpful fashion. As best the Court can determine, the record primarily groups documents together by type – *e.g.* all "outgoing" letters from the Defendant are grouped together in the record, separately from the correspondence they respond to; all file notes are grouped together, regardless of when they were written, etc. This unorthodox method of organizing the record makes it extremely awkward to follow any exchange of correspondence, as a given letter will be found in one place in the record and the response to it will be found in a completely different section. Second, no index as to the record is provided. Third, the record was electronically-filed by the parties as 13 separate parts, each simply cut off at 30 pages, separating the contents of some multi-page documents between parts. Fourth, when filing the parts electronically, the parties have simply labeled each "part" with a letter – part a, part b, etc. – providing no guidance as to the page numbers or content included in each part. Fifth, the parties have indiscriminately included material that is of no relevance to this proceeding. In particular, dozens of pages do nothing more than reproduce envelopes that correspondence was sent in, even though the issue of whether and when a particular document was sent is not generally an issue. Although it is necessary that the parties produce the entirety of the relevant portions of the Administrative Record, it is not necessary for the parties to reflexively produce documents that might arguably be part of the record, but which have no relevance to the issues herein.

[2]As discussed below, there is some dispute between the parties as to whether Prudential is technically the Administrator of the Plan. Because that issue does not strictly affect the merits of the primary issue, the Court will treat Prudential as if it were the proper Plan Administrator.

to "sickness or injury." The Plan also contains various other provisions and limitations discussed more fully below.

On or about November 6, 2002, the Plaintiff ceased working an applied for disability benefits under the Plan. AR[3] 287-89. She listed her disabling medical condition as "Fibromyalgia symptoms" such as "fatigue, achiness all over, pain in neck, back." She listed her primary physician as Michael Piel, and noted that she had also been treated by Dr. Hatfield, a rheumatologist; Dr. Davis, an oncologist; Dr. O'Brien, a sleep specialist, and several other physicians for treatments including "acupuncture and herbs" and "liver detox." AR 293- 298.

Prudential requested that the Plaintiff's doctors submit statements regarding the Plaintiff's condition, and apparently received responses from Drs. Hatfield, Piel, Davis, and O'Brien. Dr. O'Brien's primary report, dated February 6, 2002, reports that the Plaintiff displays symptoms of insomnia, and has displayed such symptoms since receiving treatment for ovarian cancer in mid-1999. AR 273-74. He reports that "during the past year," apparently meaning 2001-02, she has had difficulty "turning off her mind" and going to sleep. Dr. O'Brien attributes this to "some anxiety issues during the day that spill over into the night." He diagnosed the Plaintiff has having "chronic predominately sleep onset insomnia for 3+ years." He believed that "a significant degree of anxiety [ ] is making it difficult for her to go to sleep." He prescribed that she continue taking Effexor (an serotonin reuptake inhibiting antidepressant), and that she try using Trazodone (a sedative and antidepressant); he recommended relaxation exercises, and, if progress was not made, consultation with a psychiatrist.

---

[3]Citations to "AR __" refer to the Bates-numbered pages of the Administrative Record at Docket # 44.

Dr. Hatfield's report, dated November 22, 2002, states that the Plaintiff has "signs typical of fibromyalgia, including fatigue and lethargy, sleep disturbance [and] pain and aching all over." AR 240-41.  He noted that "All this has been present for about three-and-a-half years since she finished chemotherapy for ovarian cancer."  After noting a variety of normal physical observations, along with the observation of "tender points in universally typical sites," he concludes that she has "full-blown fibromyalgia," and diagnosed regular use of Effexor, Trazodone, Ambien (a sleep aid), Xanax (an anti-anxiety drug), and Neurontin (an anti-seizure medication also used for neuropathic pain relief), in addition to as-needed use of Vioxx (an anti-inflammatory) and Ultracet (a pain reliever) among the other medications she was taking for other conditions.  In a separate statement, submitted as part of the Plaintiff's application for benefits, Dr. Hatfield wrote that the Plaintiff was restricted from "any sustained physical activity, unable to meet deadlines or function predictably."  AR 282.  Asked of the Plaintiff's prognosis for a return to work, Dr. Hatfield wrote "guarded – depends on future course."  *Id.*  A treatment note from a subsequent visit to Dr. Hatfield by the Plaintiff indicates Dr. Hatfield's impression of "severe fibromyalgia.  Functioning only borderline at activities of daily living."  AR 239.

Dr. Piel's treatment notes appear in the record, but there is no summary report.  AR. 208-233.  Dr. Piel's statement on the Plaintiff's application notes simply that he diagnosed her as suffering from fibromyalgia, that she experiences "fatigue," that she is "unable to work," and that the prospects of her return to work are "poor."  AR 228-29.  Dr. Piel's notes begin on January 29, 2001, when the Plaintiff presented with problems of not being able to sleep, stating that since her chemotherapy two years ago, she "feels very emotional and somewhat depressed, [increasing] anxiety."  AR 216.  In July 2001, the Plaintiff presented to Dr. Piel with acid reflux symptoms that

she had suffered for the past year.  AR 214.  She presented with a foot injury in September 2001,

and again in February 2002 with continuing sleep problems, for which Dr. Piel diagnosed her as

having anxiety.  AR 213.  On November 5, 2002, the day before the Plaintiff stopped working,

she visited Dr. Piel, presenting with "trouble sleeping, stress, joint, neck and back pain.

Wondering if she has fibromyalgia.  Wants to discuss long term disability.  Symptoms began 3½

years ago."  AR 212.  At this visit, Dr. Piel notes "neck and back pain, join pain, sleep disorders.

Has diagnosis of probable fibromyalgia."  He prescribes a visit to Dr. Hatfield, the drug Flexeril (a

muscle-relaxant), and "will get forms for disability."  *Id.*  Notably, this is the first record Dr. Piel

has of the Plaintiff complaining of generalized pain.  The remaining notes from Dr. Piel note only

a visit by the Plaintiff to complete FMLA paperwork in November 2002 and a January 2003 visit

in which the Plaintiff reports unwanted side effects from the Trazodone and Neruontin prescribed

by Dr. Hatfield.

    The records from Dr. Davis, a gynecologic oncologist, are difficult to read, and, in

general, do not appear to bear on the issues herein.  AR 247-269.

    On February 24, 2003, Prudential denied the Plaintiff's claim for benefits.  AR 335-339.

In its letter explaining the denial, Prudential set forth many of the preceding facts gleaned from

Drs. Hatfield, Piel, and O'Brien.[4]  Prudential concluded that "you have had similar symptoms

since 1999 and you have been able to work with them.  In addition, your records do no show a

significant change in your chronic condition.  There is also no documentation of a medically

_____

    [4]The only major item of information found by Prudential that the Court has not located in
the Administrative Record is an acknowledgment by Dr. Hatfield that the Plaintiff's fibromyalgia
symptoms have been present for three years.  AR 337.

5

determinable functional impairment that would prohibit you from performing the material and substantial duties of your work."

On April 23, 2003, the Plaintiff's counsel wrote to Prudential, expressing the Plaintiff's intention to appeal the denial. AR 182-192. After requesting certain information, the letter argues that the Plaintiff is entitled to benefits. The letter cites heavily to Dr. Hatfield's findings as to the Plaintiff's diagnosis of fibromyalgia and his observations as to her ability to work. It also notes Dr. Piel's diagnosis and statement that the Plaintiff is unable to work. It acknowledges that "the early symptoms of fibromyalgia began to be noticed in the Spring of 1999 with hyper-sensitivity, pain (especially in the neck and upper back) and prominent fatigue." AR 185. But it goes on to argue that "There is no basis for assuming that the course of Sherry Timm's illness was steady or like a plateau." The letter takes particular issue with Prudential's citing of a policy provision limiting the "pay period" of benefits resulting from a sickness or injury that is based primarily on "self-reported" symptoms, and the Plaintiff's appeal letter argues extensively that fibromyalgia is a recognized medical condition diagnosable by objective observations. The letter concludes by stating that the Plaintiff intends to furnish "additional evidence, including commentary, argument, medical reports and data."

The Plaintiff supplied some additional medical information on August 13, 2003, in the form of a report by Dr. McGovern, a psychologist. AR 169-172. Dr. McGovern reports that the Plaintiff presented with "fibromyalgia, fatigue, extreme pain, memory problems, easily stressed, easily overwhelmed, gets confused," and that the Plaintiff reported that these problems started in chemotherapy in 1998 and have gotten worse. Dr. McGovern diagnosed the Plaintiff as having, on Axis I (mental disorders), a depressive disorder and generalized anxiety disorder; on Axis III

(medical conditions contributing to the mental disorder), "status post ovarian cancer, fibromyalgia, [acid reflux disease], and insomnia"; and on Axis IV, severe psychosocial and environmental factors contributing to her disorder. Dr. McGovern discerned a connection between the Plaintiff's physical complaints and her mental health, anticipating that "if this patient were to receive appropriate psychiatric care [ ] both her anxiety and depressive symptoms as well as potentially her physical complaints associated with fibromyalgia might improve with time." AR 172. He observed that "the patient is struggling with a great deal of physical complaints which only exacerbate her feelings of helplessness which worsen her depressive and anxiety symptoms" and "conversely, if her fibromyalgia was better controlled, then it is anticipated that her psychiatric symptoms would also improve." *Id.*

On November 10, 2003, the Plaintiff's attorney again wrote to Prudential, supplying additional medical information and argument. AR 144-149. The medical information consisted of a September 23, 2003 letter from Dr. Hatfield that stated, in its entirety, "This patient has debilitating fibromyalgia; present for over four years. It continues unabated. She remains disabled and all medical probability will remain so indefinitely, certainly more than 12 months." AR 150. In addition, the Plaintiff supplied a letter from Dr. Davis, reading, in pertinent part, "Sherry Timm has been a patient of mine since 1998. I am aware that she has experienced extreme fatigue and joint and limb pain for a number of years. I have been told that she was diagnosed with fibromyalgia by her rheumatologist." AR 151. The Plaintiff's counsel argued further that the Plaintiff was disabled under the terms of the Plan.

On December 31, 2003, Prudential informed the Plaintiff that it had decided to deny her appeal.[5]  The denial letter summarized the history of the issue, including reference to the evidence previously considered, then recited in detail the pertinent points of Dr. McGovern's report. *Docket* # 44-14 at 8-12.[6]  Prudential's conclusion was that:

> Neither Dr. Piel's not Dr. Hatfield's physical examinations document Ms. Timm's physical capacity or functionality, or note her tender pain points, testing commonly seen when the diagnosis of fibrymyalgia is opined.  The diagnosis of fibromyalgia appears to be based on Ms. Timm's self-reported symptoms.  Medical documentation does not support Ms. Timm is physically unable to perform the duties of her regular occupation.
>
> In addition, medical records document that Ms. Timm has reported insomnia, pain, and fatigue for several years during which time, she continued to work.  This supports that Ms. Timm has worked in the past with the same complaints she is currently reporting as disabling. . .
>
> Both Dr. O'Brien and Dr. McGovern opine Ms. Timm has anxiety and/or depression and anxiety.  There is also documentation that supports Ms. Timm has had good response to the antidepressant medication Effexor.  While it appears Ms. Timm has a psychiatric component to her reported symptoms, she has not been receiving appropriate care by a mental health care provider.  Therefore we are unable to consider her psychiatric diagnoses for our review.

*Docket* # 44-14 at 11.

On July 30, 2004, the Plaintiff's attorney again wrote to Prudential, announcing the Plaintiff's intention to appeal.  AR 129-133.  In addition to complaining of not having received

---

[5]The denial was based in large part on a review of the Plaintiff's medical records by Prudential's Medical Director, Dr. Fegan.

[6]The Bates numbers on this document overlap those found elsewhere in the Adminstrative Record.  To avoid confusion, the Court will cite to these documents at their location within the Court's electronic case file.

certain information she requested, the Plaintiff also raised eight points regarding the merits of her

eligibility for benefits: (i) that Prudential "ignored, minimized, or misunderstood" the submissions

she had made; (ii) that the denial letter does not specifically cite which portions of the Plan that it

relies upon; (iii) that to the extent the Plaintiff's condition results from a mental illness, it falls

within an exception to the mental illness limitation for mental illnesses caused by conditions not

typically treated by mental health providers (*i.e.* that her mental condition is caused by her cancer,

treatment, or her fibromyalgia); (iv) that any mental health issues are secondary to her physical

disability; (v) that the diagnosis is not based on "self-reported" symptoms; (vi) that Prudential

falsely assumes that because the symptoms existed while the Plaintiff was able to work, that she

continues to be able to work; (vii) that Prudential's letter acknowledges that the Plaintiff has the

described symptoms; and (viii) that Prudential failed to consider the brief supplemental opinions of

Dr. Hatfield and Dr. Davis from September 2003.

On March 15, 2004, Prudential again denied the Plaintiff's appeal.[7]  The denial letter again

recited the proceedings to date, then set forth the reasons behind Prudential's finding in detail.

AR 361-65.  In particular, it noted:

> • That Dr. Piel's records show that the Plaintiff had no complaints
> in an examination on October 7, 2002, only to present with a belief
> that she had debilitating fibromyalgia one month later.  It notes that
> Dr. Piel's records do not document a physical examination of the
> Plaintiff at any time.
>
> • That Dr. Hatfield's records indicate that his physical examination
> of her on November 27, 2002 was uniformly normal (*e.g.* "muscle
> strength is fine, . . . joints were 'good'," etc.), and that Dr.

---

[7]This denial was based largely on a review of the Plaintiff's records by Dr. McBride, a
physician specializing in Occupational Medicine.

Hatfield's diagnosis of "full-blown fibromyalgia" is inconsistent with such an examination.

• That Dr. Hatfield's December 30, 2002 notes that state that the Plaintiff has severe fibromyalgia and is functioning only at borderline activities of daily living, yet recites no physical examination yielding such a conclusion and does not report what examples the Plaintiff gave of problems with her daily activities.

• That Dr. McGovern found the Plaintiff's mental capacity to be intact, and that her problem was primarily one of anxiety and depression.

• That the September 2003 statements of Drs. Hatfield and Davis are not correlated to any findings or medical records supporting those conclusions, and moreover, that Dr. Davis' statement merely recites that which he has been told.

• That the records show that the Plaintiff's physical examinations do not document her lack of functionality, nor reveal tender/painful points that are customarily tested to confirm a diagnosis of fibromyalgia.  "It is not clear what the diagnosis of Fibromyalgia appears to be based on, other than Ms. Timm's self-reported symptoms, and even then, her physical exams are noted to be essentially normal."

The letter further advised the Plaintiff that she could take a final appeal to Prudential's Appeals Committee.

On July 13, 2004, the Plaintiff requested just such an appeal.  AR 107-113.  Again, the letter complained about not receiving requested documentation, and set forth arguments that Prudential had "emphasize[d] some medical findings at the expense of others" and attempted to suggest that her mental condition, not her physical condition, was the basis for any inability to function.  Shortly thereafter, the Plaintiff supplied Prudential with the findings of the Social Security Administration that had concluded the Plaintiff was eligible for disability benefits.

Prudential submitted the Plaintiff's records to an external physician, Dr. Martin, a specialist in Occupational Medicine, for review.  On September 1, 2004, Dr. Martin issued a report, finding that there was no medical evidence in the record to support the diagnosis of fibromyalgia.  AR 60-67.  Dr. Martin states that "a detailed tender point examination [is] suggested by the American College of Rheumatology for the diagnosis [of] fibromyalgia," and notes his concern with the "inconsistency in Dr. Hatfield's information . . . with respect to not documenting this in the physical examination."  He further notes that the treatment the Plaintiff has been receiving is not consistent with that commonly prescribed for patients with fibromyalgia, specifically, that the Plaintiff was not prescribed tricyclic antidepressants instead of serotonin reuptake antidepressants, and that the Plaintiff was not placed in a rehabilitation program focusing on aerobic exercise.  "This is a fundamental treatment tenet in the diagnosis of fibromyalgia," he states.  Dr. Martin further criticizes Drs. Hatfield and Piel for concluding that the Plaintiff is disabled, as doing so is "counter to the current [thought] process and recommendations in the treatment of fibromyalgia."  He states that a "fundamental treatment tenet" is that patients should "resume normal activities as soon as possible," including work, and that "oftentimes . . . physicians iatrogenically[8] make patients disabled by erroneously giving them a dismal view of the diagnosis and do not indicate the absolute necessity to remain productive members of society."  Based on Dr. Martin's review of the records, he did not see any obstacle to the Plaintiff returning to work.  He also refutes the Plaintiff's counsel's suggestion that the Plaintiff's symptoms of pain are not inconsistent with an otherwise normal physical exam.

---

[8]An iatrogenic condition is one which is induced in a patient by a physician's actions.

After Dr. Martin issued his findings, but before Prudential took action on them, the Plaintiff submitted supplemental evidence, in the form of additional treatment records from Dr. Hatfield. AR 36-59. Those records consist largely of treatment notes from the months following Dr. Hatfield's initial report in September 2002. A December 30, 2002 treatment note is primarily concerned with the Plaintiff's drug regimen and her complaints about sleep difficulties, but does note Dr. Hatfield's continuing diagnosis of "severe fibromyalgia," and his impression that the Plaintiff is "functional only borderline at activities of daily living." AR 54. This note reflects that the Plaintiff did not have good result with Trazodone, and that Dr. Hatfield suggested an increased dosage of Amitriptyline (a tricyclic antidepressant). He also considered trying Tompamax (another anti-seizure medication and neuropathic pain reliever) in place of Neurontin, and Zanaflex (a muscle relaxant).

A February 13, 2003 treatment note again recites the Plaintiff's complaint of sleep difficulties, along with "severe, constant, generalized pain." AR 53. The focus of this note is more discussion of the Plaintiff's drug regimen, along with a recommendation that the Plaintiff "continue to try for gentle walking and for disciplined sleep status." Specifically, Dr. Hatfield notes that the Plaintiff initially had some relief from Amitriptyline, but was receiving less benefit from it lately; that Zanaflex was not helpful, and that neither Neruontin nor Tompamax were tolerable. Dr. Hatfield states that "if we can use more Amitriptyline, we will," and contemplates possibly also using Orphendarine (a muscle relaxant).

An August 29, 2003 note reflects "no change"; that the Plaintiff is "tired, weak, and lethargic," with "poor exercise tolerance[,] aches all over, [and] tender points," among other things. AR 52. Dr. Hatfield notes that the Plaintiff "has not been taking Amitriptyline at all," but

12

that "we will try this approach again" using a higher dosage.  He observes "no substantial

progress in her overall well being," that she is "not working[,] mostly resting but trying to do

some walking."   Dr. Hatfield's final treatment note in the supplemental submission is from May

28, 2004, which states "fibromyalgia is about the same."  AR 50.  It notes that the Plaintiff has cut

her Amitriptyline usage "down to 25 to 50 mg a bedtime since she thinks 75 to 100 caused high

blood pressure.  We have discussed that.  It seems most unlikely but she prefers to continue this

way."  Dr. Hatfield notes that the Plaintiff reports that her use of Vioxx "does help her

symptomatically a lot."  She presented at this visit with pain and tenderness in her hands, which

Dr. Hatfield diagnosed as "some inflammation and could have carpal tunnel syndrome."   He

prescribed additional tests on this issue, and that she "continue the other program for

fibromyalgia."

        The only other meaningful information in the Plaintiff's supplemental submission of Dr.

Hatfield's records is a letter from Dr. Hatfield to the Plaintiff's counsel, dated August 4, 2004.

AR 49. That letter reiterates Dr. Hatfield's opinion "that she has severe fibromyalgia and cannot

work."  Apparently responding to a question as to the cause of the condition, Dr. Hatfield writes

that "no one can commit regarding [the cause] of fibromyalgia.  That fact that her condition

followed the ovarian cancer and chemotherapy is clear, but there is no proof of causation.  At

best, it is an instance of post hoc ergo propter hoc.[9]"

        Prudential forwarded the supplemental records to Dr. Martin for reconsideration, but by

letter dated October 11, 2004, Dr. Martin stated that the additional records did not alter his

---

        [9]Literally, "after this, therefore because of this" – *i.e.* the logical fallacy that the latter
condition must be caused by the former simply because it followed in time.

13

conclusion.  AR 31-32.  Dr. Martin's supplemental response does not directly address any of the supplemental material from Dr. Hatfield, noting only that "after reviewing the additional information you have presented, there is nothing in the medical record or additional supporting records that would change my opinion."  Dr. Martin reiterates that "It is my opinion that this lady does not have the diagnosis of fibromyalgia.  It is also my opinion that this does not have any scientific evidence to support her ongoing belief that she cannot work within her job as listed."

On October 22, 2004, Prudential formally advised the Plaintiff that it was denying her final appeal, essentially for the reasons stated by Dr. Martin above.  AR 344-47.  On January 26, 2005, the Plaintiff, through counsel, requested to reopen the record, stating that she had not been given an opportunity to respond to Dr. Martin's reports.  AR 15-23. She claimed that there were additional medical records that Dr. Martin had not reviewed, and submitted a report that Dr. Hatfield had issued on January 11, 2005 rebutting Dr. Martin's conclusions.  By letter dated February 15, 2005, Prudential explained that the Plaintiff had exhausted her appeals, but stated that "we will review the additional documentation that you submitted with our Appeals Committee and advise you as to whether this newly submitted information alters the prior determination."

Of particular note is Dr. Hatfield's January 11, 2005 response to Dr. Martin's report.  AR 24-15.  Dr. Hatfield writes that "Dr. Martin questions my statement at the time of my initial evaluation of Ms. Timm to the effect that she had universal tender points typical of fibromyalgia. . . . [T]hat statement means that she had all the tender points required for the diagnosis; indeed, all

the tender points named traditionally."[10]  He explains that he did not specifically list the tender points in his initial report because "when they are present as a whole[, doing so] would be redundant and unnecessary."  He acknowledges that "most of the diagnostic features of this mysterious condition are subjective, and [ ] there is no 'objective scientific basis' for either the diagnosis or the determination of disability as there is in so many conditions."  Dr. Hatfield opines that, from Dr. Martin's statements as to what he reviewed, Dr. Martin appears to have not had access to the numerous additional treatment notes discussed above.  He emphasizes that he does not purport to opine as to whether the Plaintiff is disabled in an occupational sense, but has only stated his opinions as to the condition and capabilities of the Plaintiff.  Nevertheless, he states that, based upon his observations, "I do believe her to be unable to support herself through gainful work.  To me she is disabled."  Dr. Hatfield concludes with some remarks about Fibromyalgia as a condition.  He writes that it "affects different patients differently and varies from time to time in the same patient.  The difference between it and most diseases we treat is that there are so few objective signs to use.  This does not make the disease less important or less disabling."

The record does not clearly reflect the extent of Prudential's internal evaluation of this evidence.  On April 28, 2005, Prudential simply advised the Plaintiff that "the Appeals Committee reviewed the additional documentation and determined that it did no alter their previous decision."[11]

---

[10]Later in his letter, Dr. Hatfield notes that more recent medical textbooks state that "limiting one's examination to the traditionally named points is no longer the standard."

[11]It appears from the record that the Plaintiff did not receive the April 28, 2005 letter, and learned of its existence only in September 2005.

The Plaintiff commenced this action on November 23, 2005.  Her Amended Complaint **(#10)** alleges: (i) a claim for benefits under the Plan, pursuant to 29 U.S.C. § 1132(a)(1)(B); (ii) a claim for damages for failure to furnish Plan documents in violation of 29 U.S.C. § 1132(c); and (iii) a claim for "other benefits" – apparently "continuance, at the expense of Panasonic, of other benefits and coverages, including health coverage and benefits and life insurance based on Panasonic's employee benefit plans."  With regard to the last claim, she asserts that the loss of such benefits is the "direct, natural, and proximate result of the failure of defendants to approve and pay [long-term disability] benefits under the Plan," and that Panasonic and Prudential are "jointly and severally liable for such benefits and related damages."

## ANALYSIS

### A.  Claim for benefits

29 U.S.C. § 1132(a)(1)(B) is the portion of ERISA that permits plan participants to sue for benefits due under the terms of a benefit plan.  Any dispute over the application of the terms of the benefit plan is resolved by the Court *de novo*, unless the terms of the plan give the plan Administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.  *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 210 (2004).  The parties agree that the terms of the Plan confer discretion on Prudential to determine eligibility for benefits, and thus, the Court reviews Prudential's decisions for abuse of discretion.

It is also undisputed that Prudential operates as both the insurer of the Plan and the Plan Administrator, creating an inherent conflict of interest.  *DeGrado v. Jefferson Pilot Life Ins. Co.,* 451 F.3d 1161, 1167 (10th Cir. 2006).  Where such a conflict exists, the burden is on the Plan Administrator to show that: (i) its interpretation of the terms of the Plan is reasonable; and (ii) its

16

application of those terms is supported by substantial evidence.  *Id.* at 1168.  The Court must take

"a hard look at the evidence and arguments presented to the plan Administrator to ensure that the

decision was a reasoned application of the terms of the plan . . . untainted by the conflict of

interest."  *Id.*

      Because Prudential's October 22, 2004 decision on the Plaintiff's final appeal represents

its most focused and comprehensive statement of its reasoning, the Court begins its analysis there.

That decision cites several definitional portions of the Plan, but except as discussed later,

Prudential does not purport to interpret any allegedly ambiguous portion of any of Plan term in

making its determination.  Simply put, Prudential reasonably understood the Plan to provide that

the Plaintiff is disabled if, because of sickness or injury, she cannot perform the duties normally

required for the performance of her job.

      Where the parties' primary dispute lies is in the question of whether the facts found in the

record show that the Plaintiff meets that definition.  Because, as a result of its inherent conflict of

interest, Prudential bears the burden of pointing to substantial evidence in the record showing that

the Plaintiff is <u>not</u> disabled by sickness or injury.  The only affirmative evidence in the record

supporting Prudential's conclusion is the report of Dr. Martin, rejecting both the diagnosis of

fibromyalgia and the conclusion that the Plaintiff is disabled.  Having carefully reviewed Dr.

Martin's opinion, the Court notes that it is premised upon three major findings by Dr. Martin: (i)

that neither Dr. Piel nor Dr. Hatfield indicate that the conducted a tender point examination, the

standard diagnostic tool for diagnosing fibromyalgia; (ii) the treatment of the Plaintiff reflected in

her doctors' notes does not conform to accepted treatment methodologies for fibromyalgia; and

(iii) that the Plaintiff needs additional psychiatric care.  Dr. Martin does make other observations,

which the Court will discuss later, but primarily, his opinion as to the existence and extent of the Plaintiff's disability is grounded in these three issues.

Turning first to Dr. Martin's observation that neither Dr. Piel nor Dr. Hatfield conducted a tender point examination, the parties appear to agree that the standard approach to diagnosing a case of fibromyalgia requires examination of whether the patient is experiencing pain in at least 11 of 18 separate points on the body, with at least one point in each of four body quadrants.[12]  Dr. Hatfield's initial report, dated November 27, 2002, states that the Plaintiff "has . . . tender points in universally typical sites."  The precise meaning of Dr. Hatfield's use of the term "universally typical sites" is somewhat unclear, largely due to the odd placement of the word "universally."  If Dr. Hatfield's intention was to use that word to modify the adjective "tender," the implication would be that the Plaintiff's "typical sites" were "universally tender" – that is, that all 18 points were found to be tender.  However, in its actual placement, it appears that the word "universally" modifies the adjective "typical," supplying a meaning that at best is unclear, and at worst is redundant.  The Court can understand Dr. Martin's difficulty in evaluating the meaning of this portion of Dr. Hatfield's report, particularly in light of the lack of any further discussion of the Plaintiff's symptoms, and the otherwise throughly normal physical exam Dr. Hatfield goes on to describe.  If Dr. Hatfield's November 27, 2003 report were the only evidence in the record supporting Dr. Hatfield's diagnosis, the Court might well agree with Prudential that it fails to adequately support that diagnosis.

---

[12]Dr. Hatfield's rebuttal to Dr. Martin's report appears to suggest that this is no longer a proper diagnostic approach, but neither party in this case has suggested that the tender point examination is not the currently-accepted standard for diagnosis.

But there is additional evidence in the record, in the form of Dr. Hatfield's rebuttal to Dr. Martin's report.  Although this rebuttal was submitted after the disposition of the Plaintiff's final appeal, Prudential expressly agreed to consider it.  The rebuttal largely clears up any confusion as to whether Dr. Hatfield performed a tender point examination, stating that "she had all the tender points required for the diagnosis," and that he did not expressly recite his findings in detail in his report because he considered that redundant.  The record becomes oddly silent after Dr. Hatfield's rebuttal was submitted – nothing in the record shows that Prudential forwarded Dr. Hatfield's letter on to Dr. Martin, nor what response Dr. Martin might have had.  Nor does the record reflect the specific findings of Prudential's in-house medical team or the Appeals Committee with regard to Dr. Hatfield's clarification.  Given that Dr. Martin's only criticism was that Dr. Hatfield's initial report did not unambiguously indicate <u>whether</u> the standard tender point examination was conducted (*c.f.* how the examination was conducted, or how the results of that examination were reconciled with other observations), the Court finds that a reasonable factfinder would have deemed Dr. Hatfield's rebuttal to clarify that such a test was indeed performed, thus putting Dr. Martin's first concern to rest.

Dr. Martin's second complaint was that the Plaintiff's treatment regimen was inconsistent with the standard protocol used for fibromyalgia patients.  Dr. Martin makes three separate observations on this point: (i) that the Plaintiff was being treated with serotonin reuptake inhibitor antidepressants instead of the standard treatment of tricyclic antidepressants; (ii) that the Plaintiff was not encouraged to engage in rehabilitation or aerobic exercise; and (iii) that the Plaintiff's physicians should have encouraged her to return to work, thereby avoiding any iatrogenic aggravation of her condition.  Once again, on the record that was before Dr. Martin at the time of

his report, these observations may have been well-founded.  But the Plaintiff submitted, and Prudential agreed to consider, additional evidence of the Plaintiff's treatment by Dr. Hatfield that should have resolved this concern.

Dr. Hatfield's treatment notes show that beginning in December 2002, the Plaintiff was placed on Amitriptyline, a tricyclic antidepressant, and that the Plaintiff did indeed experience some initial relief from that drug before moving to a reduced dosage.[13]  Similarly, Dr. Hatfield's treatment records show that on February 13, 2003, he encouraged the Plaintiff to "continue to try for gentle walking," but that as of August 29, 2003, the Plaintiff was showing "poor exercise tolerance."  That same treatment note observes that the Plaintiff was nevertheless "trying to do some walking," and Dr. Hatfield recommended that she "continue the . . . program" that they had previously discussed.  Once again, this information would appear to refute Dr. Martin's conclusion that the Plaintiff was not being encouraged to engage in physical activity.   Finally, Dr. Martin states that, to avoid any risk of iatrogenic disability, a doctor treating a fibromyalgia patient should encourage the patient to return to work as soon as possible.  Dr. Hatfield's notes do not specifically state that he encouraged the Plaintiff to continue to work, nor do they reflect the vigorousness of any such encouragement.  What they do reflect is Dr. Hatfield's belief that the Plaintiff's symptoms prevented her from being able to work – specifically, that she was restricted from "any sustained physical activity, unable to meet deadlines or function predictably."

---

[13]Arguably, the Plaintiff's insistence on a reduced dosage of Amitriptyline, apparently over Dr. Hatfield's suggestion, might constitute a failure to continue to receive "Regular/Appropriate care" under the terms of the Plan, and might constitute a ground for Prudential refusing to pay future benefits.  But because Prudential has never alleged that as a basis for denying benefits in the first instance, the Court need not consider it for purposes of determining whether Prudential's finding that the Plaintiff was not disabled was proper.

Assuming this to be an accurate assessment of the Plaintiff's actual limitations – and Dr. Martin's report does not expressly dispute that they were – the suggestion that Dr. Hatfield should have encouraged the Plaintiff to work notwithstanding limitations that would appear to make it impossible seems unreasonable.

Finally, Dr. Martin's report notes that the Plaintiff needs to have more psychiatric care. This does not appear to be a controversial point – Dr. McGovern agrees entirely. However, nothing in Dr. Martin's report suggests that the failure to receive psychiatric care bears directly on the question of whether the Plaintiff also has fibromyalgia, or whether that condition is disabling. Indeed, Dr. Martin notes that "it is quite common for individuals with the diagnosis of fibromyalgia to have concomitant psychological and psychiatric disorders." Thus, the mere fact that the Plaintiff may have an un- or under-treated mental illness does not necessarily refute the existence and consequences of her diagnosed fibromyalgia.

Thus, the Court finds that the supplemental submission of Dr. Hatfield's treatment notes and rebuttal letter sufficed to alleviate all of the major objections raised by Dr. Martin's report.[14] Because the record does not reflect that Dr. Martin maintained or clarified his objections in light of the Plaintiff's supplemental submissions, the Court is left with the conclusion that Dr. Martin's concerns were effectively ameliorated. Without Dr. Martin's assessment that the Plaintiff was not disabled – an assessment that depended upon findings refuted by the Plaintiff's supplemental submissions – there is no evidence in the record to support Prudential's determination. Thus,

---

[14]Dr. Martin's report does refute the contention repeatedly urged by the Plaintiff's counsel that the diagnosis of fibromyalgia follows as a direct consequence from her diagnosis and treatment for ovarian cancer. Dr. Martin expressly disclaims any medical evidence that cancer has any causative effect on fibromyalgia, and Dr. Hatfield expressly refused to suggest that there was any valid basis for believing in any causal connection between the two diagnoses.

Prudential has not carried its burden of showing that substantial evidence in the record supports its conclusion that the Plaintiff is not "disabled" under the terms of the Plan.

Prudential's denials of the Plaintiff's prior appeals were based primarily on an entirely different conclusion – that because the Plaintiff had had similar symptoms for the three years prior to her formal diagnosis of fibromyalgia, yet was able to work, she must still be able to continue. At its heart, such a conclusion operates on the premise that fibromyalgia is non-progressive; that is, that its symptoms cannot become more severe over time.  The Court notes that there is no evidence in the record addressing whether fibromyalgia is or is not progressive, a defect in the record that weighs against the party with the burden of proof – *i.e.* Prudential.   Prudential's earlier denials appear to assume that the disease is not progressive, but identify no evidence supporting that contention, and Dr. Martin's letter makes no mention whatsoever of this issue, despite his having reviewed all of the same records that Prudential's in-house staff had considered in reaching their decisions.  At best, the only evidence in the record even remotely addressing this issue comes from Dr. Hatfield, who states in his rebuttal letter that "fibromyalgia affects different patients differently and varies from time to time in the same patient."  Because the only evidence in the record is that fibromyalgia may have different effects in the same patient from time to time, the Court finds that there is no factual support for Prudential's earlier conclusions that the Plaintiff's previous tolerance of her symptoms warrants the conclusion that her current symptoms were also tolerable.

Having considered all of the evidence in the record, the Court finds that Prudential has not shown that its decision that Plaintiff was not disabled under the terms of the Plan is not supported by substantial evidence in the record.  Accordingly, the Court sets aside Prudential's

22

determination that the Plaintiff is not entitled to benefits, and finds that the Plaintiff is entitled to

the payment of long-term disability benefits under the terms of the Plan.  The Court will enter a

declaratory judgment to this effect, but the determination of the amount and duration of benefits

payable under the Plan are matters requiring further consideration and action by Prudential.[15]

Because the scope of this action seeks only a review of decisions by Prudential that have already

been made, the Court declines to retain jurisdiction to assess the sufficiency of any determination

by Prudential as to the amount or duration of benefits.

### B.  Failure to furnish documents

The Plaintiff's second claim arises under 29 U.S.C. § 1132(c).  That section provides that a

Plan Administrator who fails to comply with several statutory notice requirements, or who "fails

or refuses to comply with a request for any information which the Administrator is required by

this subchapter to furnish" to a participant, may, in the Court's discretion, be held personally

---

[15]The Court declines to enter an order directing the payment of a specific benefit amount for several reasons.  First, there is no indication that the parties cannot agree upon the mechanical computations required by the Plan to determine the proper benefit amount to be paid.  Second, and more importantly, the determination that the Plaintiff was entitled to the benefits she applied for in 2002 raises a number of additional issues that are beyond the scope of the Adminstrative Record here.  Even accepting that the Plaintiff is disabled under the terms of the Plan, the Plan still contains a number of limitations on the amount of benefits a disabled individual is entitled to receive.  For example, the Plan limits individuals to 24 months of benefits only, if they are disabled as a result of mental illnesses or disabled as a result of a sickness or injury that is primarily based on "self-reported" symptoms.  There are also exceptions to these limitations that may apply.  The Plan also appears to permit Prudential to require participants who have been found to be disabled to undergo reasonable re-examination, and to continue to maintain compliance with their doctors' treatment plans.  Whether, and to what extent, any of these rules and restrictions apply to the benefits the Plaintiff will ultimately receive from Prudential is beyond the scope of this action.  The sole question presented here is whether the Plaintiff is "disabled" under the terms of the Plan.  Questions as to the level of benefits to which she is entitled as a result of this Court's determination that she is disabled are questions that Prudential has yet to consider, and which are clearly outside the scope of this litigation.

liable in the amount of up to $ 110 per day.  29 U.S.C. § 1132(c)(1).  ERISA has a variety of notice requirements imposed on Plan Administrators, including the duty to provide a plan participant with a copy of the summary plan description, 29 U.S.C. § 1021(a)(1), 1022; a copy of the Plan's annual report, 29 U.S.C. § 1023(1)(A); and updated plan descriptions at prescribed intervals, 29 U.S.C. § 1024(b)(1), among others.  Section 1132(c)(1) requires that the Administrator supply requested information, unless prevented by circumstances beyond its control, within 30 days of the request.  The Plaintiff contends that Prudential failed to comply with several of her requests for information.

Although the Court and the parties combined this issue with the appellate-type review of Prudential's substantive decision under the terms of the Plan, the sanctions available under ERISA for failure to furnish Plan documents is a standalone claim, not one for which appellate-type review is available.  Nevertheless, the parties appear to agree that the Adminstrative Record reflects all of their correspondence on this issue, and thus, the Court finds that there are no genuine disputes of material fact preventing the entry of judgment as a matter of law on this claim pursuant to Fed. R. Civ. P. 56.  Although the parties do not directly address it in their briefs, the Court will assume that the Plaintiff bears the burden of proving that she made a request for documents, that Prudential is required by ERISA to produce those documents, and that it did not timely do so.

As far as the Court can determine from the Administrative Record, the Plaintiff's first formal request for information was made in a letter she wrote on December 27, 2002, to, among others, Prudential, requesting a copy of the Long Term Disability Plan and Long Term Disability Policy.  *Docket* # 45-2.  The letter does not appear in the Administrative Record, and Prudential's

24

brief denies any knowledge of Prudential having received a copy.  The Plaintiff's copy of the letter includes a return receipt, indicating that someone at Prudential signed for the letter, but there is no indication as to who that person was or how the letter was handled thereafter.  Given that Prudential contends it never received the letter, there is no indication in the Administrative Record that it responded to the Plaintiff's request.

On April 23, 20003, as part of her first appeal letter, the Plaintiff's counsel wrote to Prudential, requesting: (i) a copy of the claims file; (ii) a copy of the Plan and any plan amendments; (iii) a copy of the applicable summary plan description; (iv) a copy of the long-term disability insurance policy; (v) "documents reflecting eligibility, participation, and enrollment" of the Plaintiff in the Plan; (vi) "documents reflecting the election or exercise of options for coverage" under the Plan by the Plaintiff; and (vii) "documents reflecting all anticipated, projected, or pro forma calculations" of benefits for the Plaintiff.  AR 183-84. Having received no response to the April 23, 2003 letter, on August 13, 2003, the Plaintiff again wrote to Prudential, reiterating her request for information.  AR 156-160.  On August 19, 2003,[16] Prudential responded to the Plaintiff's counsel's letter, purportedly enclosing a copy of the Plaintiff's claim file,[17] but making no comment with regard to any of the Plaintiff's other requests.  AR 341.

On November 10, 2003, the Plaintiff's counsel again wrote to Prudential, stating that the claim file provided did not contain documents referenced by Prudential as "medical department review" or any other internal deliberative material, and reiterated the Plaintiff's request for the

---

[16]Prudential contends its delay in responding was due to the Plaintiff not providing a release allowing Prudential to provide her records directly to her counsel.

[17]The Plaintiff's brief contends that portions of the claim file were redacted.  Whatever Prudential actually sent to the Plaintiff is not in the record.

remaining material identified in the April 23, 2003 letter.  AR 137-142.  Prudential apparently

responded to this letter on November 24, 2003, but did not make any reference to the Plaintiff's

requests for documents or supply any additional documents.  AR 342.

On January 30, 2004, the Plaintiff's counsel sent her second appeal letter, again requesting

the same items from the April 23, 2003 letter.  AR 9-13. On February 18, 2004, Prudential

responded, stating that it would be sending a copy of the Plaintiff's claim file under separate

cover, and stating that as to the remaining requests "we would need to refer you directly to the

Policyholder, Ms. Timm's employer, as we do not have that information for distribution."  AR

349.

On July 13, 2004, the Plaintiff's counsel wrote a third appeal letter, repeating the

Plaintiff's requests for information and explaining how those requests had gone unfulfilled.  AR

81-87.  The letter also advised Prudential of ERISA's penalty provisions for failing to supply

requested documents.  On July 22, 2004, Prudential responded, stating "As the Policyholder has

not provided you with a copy of the appropriate Policy, please find enclosed a copy of the Policy

which we have obtained."[18]  AR 360.  The letter explained that within the Policy, the Plaintiff

would find "an explanation of the calculation of LTD benefits, the Summary Plan Description, and

the provisions pertaining to Ms. Timm's claim based on her date of eligibility."  With regard to

the remaining requests, Prudential stated that "It is our understanding that the additional

information you have requested . . . has been provided by Ms. Timm's employer, as Prudential

does not maintain [those records]."  On September 20, 2004, the Plaintiff's counsel wrote to both

---

[18]The Plaintiff alleges that subsequent to the commencement of this action, she learned
that the policy provided by Prudential in July 2004 was not the correct policy.  The record does
not indicate the extent to which the actual policy differs from the policy she was provided.

Panasonic and Prudential, complaining that both entities' productions were inadequate.  AR 36-

38.  With regard to Prudential, the letter stated that Prudential had sent two different long-term

disability policies held by Panasonic, but that "no other plan documents" had been provided.

In a letter dated November 14, 2004, the Plaintiff's counsel requests "copies of the claim

file," including certain internal deliberative documents and reports of the external physicians who

reviewed the file, and "all plan documents that have not been previously furnished."  AR 26-27.

On December 7, 2004, Prudential responded, sending a copy of any material added to the claim

file since it was last sent, and advising the Plaintiff that "Prudential does not retain information

regarding eligibility, enrollment, or coverage election documents."  AR 343.

Finally,  there is some additional correspondence in the record by the Plaintiff's counsel,

reiterating her subsequent demand for the records, and some additional information has been

submitted by the Plaintiff as a supplement to the record, indicating that Prudential eventually

produced additional documents after this litigation had been commenced.

Without engaging in an extended analysis, the Court notes that both parties have

presented partially meritorious arguments on this issue.  Prudential argues, in slightly more than

one page, that "the undisputed Administrative Record evidences that Prudential provided plaintiff

with all documents requested that were in its possession . . . all on a timely basis."  The Court's

reading of the Administrative Record is fundamentally different.  Prudential did not respond to the

vast majority of the requests in the Plaintiff's April 23, 2003 letter until, at best, July 22, 2004.

Arguably, Prudential informed the Plaintiff in February 2004, nearly a year later, that it did not

have any of the remaining documents, but even this cursory remark is doubtful, given that among

the documents requested by the Plaintiff had requested a copy of the long-term disability

insurance policy, the very policy that Prudential was interpreting with regard to the Plaintiff's

claim.  Simply put, the Court finds that Prudential violated 29 U.S.C. § 1132(c).[19]

      However, the Court also agrees with Prudential that, notwithstanding its unlawful refusal

to provide the Plaintiff the documents she requested, the Plaintiff's ability to pursue her rights on

appeal were not adversely affected.  Prudential cites to *Utah Alcoholism Foundation v. Battelle*

*Pacific Northwest Laboratories*, 204 F.Supp.2d 1295, 1307-08 (D. Utah 2002).  There, after

finding that the plan Administrator had violated ERISA by failing to promptly produce requested

documents, the court observed that the decision as to whether to award statutory penalties is

discretionary with the court, and that in exercising that discretion, the court could consider both

prejudice and injury to the participant resulting from the missing documents.  *Id.* at 1308.  It

concluded that, other than having to resort to litigation to obtain the documents (for which the

court also considered awarding attorney's fees), the plaintiff had not been injured or prejudiced by

the failure to supply the documents.  *Id.*  It found that the penalties requested by the participant –

some $ 133,000 – were excessive, and that an appropriate penalty for the plan Administrator's

violation was $ 500.  *Id.*

      The Plaintiff does not respond to Prudential's suggestion that the Court should follow

*Utah Alcoholism Foundation*'s lead.  Indeed, her response brief merely recites the factual posture

of this claim.  This Court agrees with Prudential that although its failure to provide the requested

---

      [19]Prudential did not argue, and thus, the Court does not consider, whether ERISA strictly requires production of all of the types of documents sought by the Plaintiff.  The Court also does not consider an argument, raised by Prudential for the first time in its response brief and consisting of a single sentence without citation to the record or any legal authority, that it is not the Plan Administrator, and thus, is not required to provide documents.  However, the Court has considered the Plaintiff's concession, that the law regarding Prudential's duty to supply documents is less than clear, in setting a penalty.

documents was both unlawful and prolonged, it had little practical effect on the Plaintiff's ability

to file meaningful appeals from the denials of her claim.  Indeed, the Court notes that, at bottom,

the Plaintiff's claim always turned primarily on the particular facts of her condition and treatment,

and not on the specific terms or provisions of the Plan or insurance policy.  The Court will depart,

however, from *Utah Alcoholism Foundation*'s calculation of the appropriate penalty.  In that

case, the plaintiff first requested plan documents on January 19, 1998; it received an incomplete

copy on February 17, 1998; made another request on June 9, 1998; and ultimately received the

complete records on October 15, 1998, slightly less than 10 months after its first request.  Here,

Prudential's first tender of any plan documents occurred some 15 months after the Plaintiff's first

request, and the complete records were not produced until some three years later.  Given that this

case presents roughly triple the delay found in *Utah Alcoholism Foundation*, the Court finds that

at least a tripling of that case's $ 500 award is proper.  Moreover, given that the Plaintiff here

made many more requests that were completely ignored by Prudential than did the plaintiff in the

Utah case, the Court finds an additional increase in the penalty is warranted.  Using *Utah

Alcoholism Foundation* as a benchmark, and considering all of the facts and circumstances of this

action, the Court finds that a penalty of $ 2,500 against Prudential is appropriate, and the Court

grants summary judgment to the Plaintiff on this claim in that amount.

### C.  Related benefits

The Plaintiff's third claim, seeking unspecified benefits related to her status as disabled,

appears in the Amended Complaint to be directed primarily at Panasonic, a party with whom she

has settled all her disputes.  In any event, the Plaintiff does not assert arguments regarding this

claim in her brief on the merits, and thus, the Court dismisses that claim as moot.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court **DENIES** Prudential's Motion for Judgment **(# 52)**, and **GRANTS** the Plaintiff's Motion for Judgment **(# 52)**, as set forth herein.  Judgment will enter separately.  Upon entry of Judgment, the Clerk of the Court shall close this case.

Dated this 6th day of September, 2007

                              **BY THE COURT:**

                              _____
                              Marcia S. Krieger
                              United States District Judge

30